**Kurt MILLNER, Plaintiff,**

v.

**DTE ENERGY COMPANY, Michigan Consolidated Gas Company, Service Employees International Union Gas Workers Local 80, and Sol Mims, Defendants.**

**No. 02–CV–71658–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 2003.

Scott E. Combs, Esq., Novi, MI, for plaintiff.

Alec J. McLeod, Esq., William B. Balke, Esq., Lawrence R. Webb, Esq., Andrew A. Nickelhoff, Esq., Detroit, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This hybrid Section 301/Elliott–Larsen discrimination action is presently before the Court on two motions for summary

judgment separately filed by (1) Defendants DTE Energy Company ("DTE"), Michigan Consolidated Gas Company ("MichCon"), and Plaintiff's supervisor, Sol Mims, and (2) Defendant Service Workers International Union Gas Workers Local 80 ("Local 80" or the "Union"). Plaintiff Kurt Millner has responded to Defendants' Motions to which Response Defendants have replied. The Court also ordered supplemental briefing following the hearing held on this matter on June 19, 2003 and the parties filed Supplemental Briefs in accordance therewith. Having reviewed and considered the parties' briefs, evidence, and the Court's entire file of this matter, and having heard the oral arguments of counsel, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

Plaintiff Kurt Millner is a former MichCon Field Service Technician.[1] Millner was hired by MichCon on May 29, 1992. After three years as an Apprentice, Plaintiff became a Field Service Technician ("FST"), a position he held until his employment was terminated on April 24, 2001. As an FST, Plaintiff was responsible for field service duties, which primarily involved making service calls to MichCon customers, repairing heating and cooling appliances, and disconnecting the gas supply to appliances that needed replacement.[2] During the last three years of his employment as a MichCon FST, Plaintiff, who is Hispanic, was based at the Allen Road station where his supervisor was Defendant Solomon Mims, an African–American.

Upon being hired by MichCon, Plaintiff became a member of SEIU Local 80 and was subject to the collective bargaining agreement ("CBA") entered into by MichCon and Local 80, as well as MichCon's work rules and policies, referred to as "Company Employment Standards" ("CES"), which were incorporated into the CBA. The CBA provided for just cause termination and contained a grievance process. The CES utilized a progressive disciplinary policy and a point system to assess discipline. "Minor Work Rule" violations did not result in the assessment of any points. "Major Work Rule" violations, on the other hand, resulted in points being assessed for each violation. Pursuant to the CES, an employee was subject to discharge upon accumulation of a total of 12 points, in the event of consecutive 6–point or four 3–point violations, or a total of 15 points (including non-consecutive 6–point violations). *See* MichCon's Ex. 3, pp. 3–4. The CES further provided that an employee could remove 1 point from his record by not incurring another infraction within one year of the last infraction. *Id.* p. 9. Plaintiff testified that he was aware of and understood MichCon's point system. *See* Plaintiff's Dep., Defendant's Ex. 34, pp. 155–57.

### PLAINTIFF'S DISCIPLINARY RECORD

During the last three years of his employment, Plaintiff was disciplined by his supervisor, Solomon Mims five times, twice for Minor Work Rule violations and three times for Major Work Rule violations. On March 31, 1998, Mims gave Plaintiff a verbal warning for falsifying time. However, no disciplinary points were assessed. On December 17, 1998 Plaintiff was counseled by Mims for abuse of time, a Major Work Rule violation, and Plaintiff was assessed 3 points.[3] Plaintiff admitted that

---

**1.** After Plaintiff was discharged, on May 31, 2001, Michcon and DTE Energy merged.

**2.** If an appliance had to be replaced, that work was done by an independent dealer hired by the customer.

**3.** The CES provided that an abuse of time for

he had been running personal errands on MichCon time and agreed with the counseling and the assessment of 3 points.

On October 29, 1999, Plaintiff again was called on the carpet for a Major violation of abuse of time. Upon review and approval of Bruce Gustavson, the Director of Operations at Allen Road, Plaintiff was assessed another 3 points and was docked 2 hours of pay. The face of this discipline stated, "You now have a total of *6 points.*" (Emphasis in original). Plaintiff claims that he completed a Grievance Form regarding the October 29, 1999 discipline and gave it to his Union Steward, Brian Bersok. However, Plaintiff admitted in his deposition that he does not have a copy of this Grievance Form and MichCon never received a Grievance Form for Plaintiff with a date of occurrence of October 29, 1999.

A week later, November 6, 1999, Plaintiff was given a verbal warning by Mims for the Minor Work Rule violation of failing to complete his assigned overtime workload. Apparently, because this was a Minor violation, no disciplinary points were assessed. However, on November 10, 1999, Plaintiff submitted Grievance Form number 99–F–15 to Brian Ketterer, another Allen Road supervisor. On this Grievance Form, Plaintiff wrote in the space provided for "Statement of Claimed Grievance," "UNFAIR DISCIPLINE MAKE GRIEVANT WHOLE," stating "November 6, 1999" as the date of occurrence grieved. *See* Union Ex. G. Notwithstanding Millner's stated date of occurrence as November 6, the Union concluded that the grievance pertained to the October 29th 3–

point, 2–hour assessment, and the number was corrected to 99–F–19.[4]

On July 27, 2000, Mims issued Millner another 3–point assessment for abuse of time. The face of the discipline stated, "You now have a total of 9 points." *See* Union Ex. H. Instead of grieving this discipline, this matter was resolved by way of an agreement entered into between Millner, Mims and, in Brian Bersok's absence, Gregory Thompson, another Union steward at the Allen Road station, on November 1, 2000. The agreement provided that this specific discipline would be subject to an accelerated point reduction, i.e., rather than being subject to the standard reduction of one point reduction when the employee has no further incidents within the year following the most recent Major Work Rule violation, the agreement was that all 3 points from this discipline would be removed if Millner adhered to the Employment Standards and other work rules applicable to FSTs.

## THE UNION'S WITHDRAWAL OF GRIEVANCE 99–F–19

According to Brian Bersok, Plaintiff's Union steward, in conjunction with the review of some 218 pending grievances (from all departments at all MichCon stations, including some 25 grievances in the Field Service Department at Allen Road), he and Rich Harkins, Local 80's Executive Vice–President, met with Robert Crudder of MichCon. When they got to Grievance 99–F–19, Bersok realized that the parties had forgotten about this grievance. It was agreed that he would discuss the grievance with Mims and Millner to attempt to resolve it.

---

30 minutes or less was a Minor Work Rule violation whereas an abuse of time for 31 or more minutes was a Major Work Rule violation for which a minimum of three points must be assessed. *See* Ex. 3, p. 29.

4. At his deposition, Millner initially stated that he filed two grievances in 1999, one over

the 3–point, 2–hour assessment and one over a subsequent verbal warning. However, later in his deposition, Millner said he was not sure whether he actually filed two grievances, but he was clear that he did intend to file a grievance over the 3–point, 2–hour assessment. *See* Union Ex. D, pp. 496–509, 529–31.

When he raised it with Mims, Mims told him that Millner could have either that grievance, 99–F–19, or the November 1, 2000 3–point reduction agreement concerning the July 27, 2000 discipline, but not both. Mims told Bersok that he did not know about any grievance from the October 28, 1999 disciplinary action when he entered into the November 1, 2000 agreement. Bersok, in turn, explained the status of the matter to Millner and told him that he had a choice between the two. He told Bersok that he wanted to think about it and would let him know his answer the next day. The next day, Millner told Bersok that he chose to keep the 3–point one year reduction agreement and withdraw 99–F–19 regarding the October 28, 1999 3–point, 2–hour grievance. On the basis of Millner's statement, Bersok told Harkins that Millner had agreed to withdraw 99–F–19.

Relying upon Bersok's representation of Millner's approval, Harkins withdrew the grievance when he and Bersok met again with Crudder on March 30, 2001. He wrote on the grievance, "the union agrees to withdraw without prejudice to its position," (meaning that the withdrawal of the grievance would not constitute precedent for other situations.) Bersok, likewise, noted on page 10 of the Company's "Local 80 Open Grievances" list, "3–30–01 Drop without Prejudice to Position" and "settled 3–30–01."

After the grievance was withdrawn, Millner called Bersok and said that he had changed his mind, that John Paul, a Local 80 executive board member from Allen Road,[5] had told him that he could keep both his 99–F–19 grievance *and* the agreement relating to the July 2000 discipline. Bersok told Millner that the grievance had already been withdrawn and that if he, or Paul, wanted to do anything on their own, apart from the grievance process, that was up to them.[6]

*PLAINTIFF'S DISCHARGE*

A Major Work Rule set forth in the CES is the No Solicitation policy, which provides as follows:

A. Performing any work or service for personal benefit during working hours will result in *twelve (12) points*—discharge.

B. During working hours, no employee shall canvas, solicit or make arrangements to do work of any na-

---

5. Executive board members have no role or authority in the grievance procedure except that they vote, as a body, to determine whether to arbitrate a grievance which grievance Local 80 officers have determined lacks merit, when the grievant requests Executive Board review.

6. According to Millner, he never agreed to the withdrawal of 99–F–19. Yet, he admits that Bersok told him the Company said he had to choose between 9–F–19 and the November 1, 2000 agreement; that he could not have both. According to Millner, Bersok told him he did not know if the Company could do that, i.e., pull the agreement off the table. Millner told Bersok that he wanted the matter looked into, but he never talked to Bersok about it again. Instead he talked to John Paul. He testified in his deposition that he did not know that the grievance had been withdrawn until Harkins gave him a copy of it at the Step B grievance meeting (regarding his discharge grievance).

John Paul testified that when Millner came to talk to him, he (Millner) never told him that the Company had indicated he could not have both the 3–point grievance and the November 1, 2000 agreement. He testified that Millner never raised one in the context of the other and he never understood that one had anything to do with the other. He said that he simply advised Millner that if Mims wanted to pull the November 1, 2000 agreement, then Millner reserved the right to file a grievance to grieve the underlying July 27, 2000 discipline. He further testified that he understood that Mims never did pull the November 1 agreement and Millner never did file a grievance over the July 27, 2000 discipline. *See* Paul Dep., Union Ex. M, pp. 45–47.

ture except work to be performed as a Company Representative.

- No employee shall furnish prospects for the sale of any merchandise to outside firms.
- *No employee shall recommend a specific dealer to a customer whenever service from more than one dealer is available.*
- No employee shall at any time leave literature, cards, stickers or make any other type of verbal or written solicitation on customer's premises except as authorized by the Company.

*Violations of work rules in B above will subject an employee to a minimum of three (3) points and the Company may assess more points up to and including discharge as circumstances warrant.*

[Defendant's Ex. 3, p. 23 (emphasis added).]

On March 22, 2001, Kimberly Ferguson, a former employee of Downriver Comfort Sales ("DCS"), a heating and cooling company owned and operated by Mark Sawicki, a former MichCon FST, contacted MichCon and reported that a number of MichCon employees were receiving kickbacks from Sawicki for referring MichCon customers to DCS. Upon receipt of this information, MichCon immediately commenced an investigation. Ken Taylor and Tom Funtsch, a MichCon investigator, headed the investigation and they promptly interviewed Ferguson. Not only did Ms. Ferguson report the kickbacks, but also she turned over to MichCon a ledger of payments in Sawicki's own handwriting.[7]

The ledger individually named 17 MichCon employees, including Plaintiff, provided line information, noting "paid," a date of payment and a payment amount. Some line entries also noted a customer name and/or address.

The next step in the investigation was to pull Company service history records for the customers who could be identified and determine whether or not the identified MichCon employee had been on a MichCon service call to that customer on or near the date in the ledger. The investigators then attempted to contact, and made contact with some, customers to determine whether or not the MichCon employee had referred the customer to DCS. (MichCon was unable to reach all of the customers identified.)

Based on the investigation results, MichCon then used the following criteria to determine whether an FST named in the ledger was to be suspended: (1) MichCon customer history records confirmed that the employee performed service pursuant to a MichCon work order at a MichCon customer's address that could be identified in the ledger; (2) the customer confirmed that the employee referred the customer directly to Downriver Comfort Sales, and (3) the ledger showed that the employee received payment from DCS for that customer. The Company decided to suspend every employee who met *all three* criteria. Prior to suspending any employee, the employees identified in the ledger were interviewed.

After being interviewed, 11 employees—including Plaintiff—were suspended.[8] At

---

7. Plaintiff confirmed in his deposition that the ledger was Sawicki's handwriting. *See* Plaintiff's Dep., pp. 391, 619. Mark Sawicki also confirmed that he kept the ledger. *See* Sawicki Dep., pp. 61–63.

8. Those who were not suspended were returned to work because there either was insufficient evidence to establish that they re-

ceived a kickback or, as in the case of Dave Darling, who admitted that he had made a personal referral and had been paid by Sawicki, the referral was for a friend of his girlfriend's mother who resided in Berkley, not a MichCon customer serviced by Darling. (Such a personal referral does not violate the CES No Solicitation policy.)

his interview, Plaintiff acknowledged that he had referred customers to DCS, but he claimed that, contrary to the written policy, he was given the verbal "ok" to make referrals to certain dealers, and that he referred MichCon customers to DCS and to two other specific dealers. Yet, when the referral involved DCS, as Plaintiff admitted in his deposition, he further told customers that Sawicki was an "ex-employee that left and he took care of Mich-Con customers priority so they know they would be top priority if they put in a phone call." Plaintiff's Dep., p. 279. He also admitted that when he disconnected a customer's faulty appliance and left the customer's home he would call Sawicki to give him a "heads up on it." *Id.* at 272, 274–75. Millner further admitted in his deposition that being paid money by a dealer for referrals of MichCon customers violates the CES No Solicitation policy, [Plaintiff's Dep., pp. 328–30, 621], and he further admitted that he was not authorized to accept cash for a MichCon customer referral. Plaintiff's Dep., pp. 329, 621.

Millner, however, denied at his interview during the Company's investigation (and continues to deny) that he received any payment from Sawicki for his referrals. But, Sawicki's ledger showed that Plaintiff received 17 payments for referrals.

As indicated, after being interviewed, Plaintiff, along with 10 other employees, was suspended on April 10, 2001. Following the suspensions, MichCon decided that the employees suspended were subject to discharge for violation of the CES for referring business to DCS and for receiving payment from DCS. In lieu of discharge, however, MichCon decided that the employees would be assessed six Major Work Rule violation points under the Solicitation Policy. The 6 points assigned for the Major Work Rule violation put Plaintiff's total discipline points at 15 points, which required his discharge. (The assignment of

6 points did not put any other employee at or over the discipline point total requiring discharge.)

Therefore, on April 24, 2001, MichCon terminated Plaintiff's employment. Within a matter of days of his termination, Plaintiff went to work for Sawicki at DCS at the same salary he was making at MichCon.

Plaintiff admits that the decision to assess 6 points was *not* discriminatory. Plaintiff's Dep., p. 395. Moreover, it is undisputed that Sol Mims had nothing to do with the 6 point assessment or Plaintiff's termination. *Id.* pp. 205–07.

### PLAINTIFF'S DISCHARGE GRIEVANCE

On April 24, 2001, Plaintiff filed a grievance concerning his discharge. Rich Harkins was charged with investigating the grievance on behalf of the Union, and MichCon provided Harkins with the information it had compiled. Harkins showed Plaintiff MichCon's evidence.

Harkins then began gathering his own additional information. Contrary to what they had told the MichCon investigators, two of the 11 employees confessed to Harkins that they received payment from Sawicki. [Harkins Dep., pp. 41–43.] A third employee confessed to John Steffes, Vice-President of Local 80. Harkins also asked Sawicki about the payments to MichCon employees and Sawicki admitted that he had a policy of paying MichCon employees for referral of work to DCS. *Id.* at p. 21.

A "Step B" meeting on the grievance was held on September 20, 2001. The Company stood by its decision. On October 19, 2001, after a failed "Step C" meeting, Plaintiff sent Local 80 a letter requesting that it meet with MichCon and propose that he be reinstated, without any

back pay. The Union did so, but MichCon refused to change its position.

On January 25, 2002, Local 80 sent Plaintiff a letter informing him that "based on all available facts your grievance is found to be without merit" and gave him a date to appear before the Executive Board, if he so chose, to explain why the Union should pursue his grievance.

On February 6, 2002, Plaintiff appeared before Local 80's Executive Board. After being made aware of all of the evidence that MichCon and the Union had acquired, and after questioning Plaintiff, the Executive Board deliberated for an hour and a half. The Board then immediately advised Plaintiff of its 11–9 decision not to take Plaintiff's grievance to arbitration.[9]

On February 12, 2002, Plaintiff sent a letter to L. Rodger Webb, counsel for Local 80 requesting that Local 80 pursue his grievance. On February 25, 2002, Ed Woods, Secretary–Treasurer of Local 80 responded to Plaintiff's letter to Mr. Webb and explained to Plaintiff that the Executive Board's decision was final and that there are no appeal rights of a grievance arbitration decision to the International Union.

On April 15, 2002, Plaintiff initiated this lawsuit alleging claims of breach of contract (against MichCon), breach of duty of fair representation (against his Union), and ethnic origin discrimination (against MichCon and Sol Mims) under the Michigan Elliott–Larsen Act.[10]

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[11] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

**9.** One of the Board members voting in favor of arbitrating Plaintiff's grievance was John Paul.

**10.** With regard to his discrimination claim, Plaintiff is *not* claiming that his termination was discriminatory. *See* Plaintiff's Dep. p. 395. He testified that the only conduct that he believes was discriminatory was the last two 3–point Major Work Rule violations assessed by Mims.

**11.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendants' Motions for Summary Judgment in this case.

**B. *THE MERITS OF PLAINTIFF'S HYBRID SECTION 301 CLAIM***

■ The Supreme Court and Sixth Circuit have consistently held that for a plaintiff to succeed on a claim against a union for breach of its duty of fair representation, he must prove *both* that the union breached its duty of fair representation *and* that the employer breached the collective bargaining agreement. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990); *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 163–65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *White v. Anchor Motor Freight, Inc.,* 899 F.2d 555 (6th Cir. 1990).

The "interdependency" of a union employee's claims against his employer for breach of a collective bargaining agreement and against his union for breach of its duty of fair representation is well-established in this Circuit. *See, e.g., Lucas v. Leaseway Multi Transportation Service, Inc.,* 738 F.Supp. 214, 220 (E.D.Mich. 1990), *aff'd,* 929 F.2d 701 (6th Cir.1991) ("Since plaintiff's count as to the duty of fair representation fails, plaintiff's other count alleging a breach of the CBA also must fail"). Conversely, without a valid claim against the employer, the union could not be challenged because no duty to the employee would have been triggered. *White v. Anchor Motor Freight, Inc.,* 899 F.2d 555, 559 (6th Cir.1990) ("if the first claim anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it"). This interdependence of § 301 claims has been noted and approved by the Sixth Circuit:

In this hybrid suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to recover against *either*

the Company *or* the Union, Bagsby must show that the Company breached the Agreement *and* that the Union breached its duty of fair representation. **Unless Bagsby demonstrates *both* violations, he can not succeed against either party.**

*Bagsby v. Lewis Bros., Inc.*, 820 F.2d 799, 801 (6th Cir.1987) (citation omitted) (emphasis in original). *See also Black v. Ryder/P.I.E. Nationwide, Inc.*, 930 F.2d 505, 510 (6th Cir.1991) ("In any event, when the union cannot be held liable for unfair representation, of course, the employer cannot be held liable for breach of the collective bargaining agreement").

### 1. *LOCAL 80 DID NOT BREACH ITS DUTY OF FAIR REPRESENTATION*

The Supreme Court set the parameters of the duty of fair representation in the seminal case of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). As to what is required to establish a union's breach of its duty, the *Vaca* court stated:

> A breach of the statutory duty of fair representation occurs *only* when a union's conduct toward a member of the collective bargaining agreement is arbitrary, discriminatory or in bad faith.

87 S.Ct. at 916 (emphasis added).

The *Vaca* Court further determined that a union should be afforded discretion in supervising the grievance and arbitration machinery and in determining the merits of a grievant's complaints before proceeding to arbitration. The Court explained the policy behind affording the union discretion to determine what merit, if any, there is in an employee's grievance:

> In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement.
>
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievance would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

87 S.Ct. at 917.

With that policy in mind, the Supreme Court went on to hold that a union will not be deemed to have breached its duty of fair representation in exercising the discretion afforded to it in administering the grievance and arbitration machinery as statutory agent of the employees with respect to determining the merits of particular grievances unless it is found to have made that merit determination in bad faith or acted in an arbitrary manner. 87 S.Ct. at 919.

In *Air Line Pilots Association, International v. O'Neill*, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), the Court further delineated what would constitute "arbitrariness" under the *Vaca* standard:

> We further hold that *a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.*

*O'Neill,* 111 S.Ct. at 1130 (emphasis added) (citation omitted).

█ Moreover, merely characterizing a union's conduct as "arbitrary", "perfunctory" or demonstrative of "bad faith" is insufficient to withstand summary judgment. Rather, to meet his burden of proof as to the union's breach of its duty of fair representation, a plaintiff must establish by *substantial evidence* that the union acted arbitrarily, discriminatorily or with bad faith. *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Ratkosky v. United Transportation Union,* 843 F.2d 869 (6th Cir.1988) (summary judgment granted where plaintiff fails to make a showing of bad faith, discrimination or arbitrary conduct).

**a.** *Plaintiff's DFR Claim Concerning the 10/99 Grievance is Time–Barred*

█ Plaintiff first claims that Local 80 inappropriately withdrew his grievance over the 3–point, 2–hour pay discipline he received on October 29, 1999. The applicable statute of limitations for a hybrid Section 301/DFR action is six months. *DelCostello, supra; Ryan v. General Motors Corp.,* 929 F.2d 1105, 1111 (6th Cir.

1989). The claim accrues and the statute of limitations begins to run when the employee "discovers, in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Noble v. Chrysler Motors Corp.,* 32 F.3d 997, 1000 (6th Cir.1994). In this case, Plaintiff admitted that he knew as of September 20, 2001, when he was told by Rich Harkins, that his October 1999 grievance (99–F–19) had been withdrawn. He did not file his Complaint in this action until April 5, 2002, i.e., after the six-month period of limitations had expired. His claim regarding the withdrawal of the grievance, therefore, is time-barred. *Dowty v. Pioneer Rural Elec. Cooperative, Inc.,* 770 F.2d 52 (6th Cir.1985); *Moore v. UAW Local 598,* 33 Fed.Appx. 165, 2002 WL 503046 (6th Cir.2002) (DFR claim time-barred where plaintiff filed his complaint more than six months after knowing grievance had been withdrawn).

**b.** Plaintiff Has Failed to Establish his Union's Breach of Its Duty of Fair *Representation With Regard to his Discharge Grievance*

█ The record evidence in this case establishes that Local 80 did not breach its duty of fair representation. The Union not only examined the evidence that MichCon had compiled but it also conducted its own investigation during which three employees admitted receiving money from Sawicki and Sawicki himself admitted paying MichCon employees for their referrals.[12] After considering all of this evidence, it was clearly not arbitrary

---

**12.** Plaintiff makes much of the alleged evidentiary inadmissibility of Kim Ferguson's statement, Sawicki's ledger, and Sawicki's admission of payment. However, the Union was in no way bound by the Rules of Evidence in deciding whether to pursue Plaintiff's grievance. Plaintiff also argues that Kim Ferguson is not credible because she allegedly was found guilty of defrauding the Michigan Employment Security Commission. Again, the issue here is not the weight the Court might give to Ms. Ferguson's statements to MichCon but rather whether the Union acted arbitrarily or in bad faith in deciding, based on the totality of evidence, not to take Plaintiff's grievance to arbitration.

for Local 80 to vote against arbitration of a grievance that it believed was not winnable. Unions may lawfully elect not to arbitrate grievances that they determine lack merit. *See e.g., Shepherd v. Chrysler Corp.* 433 F.Supp. 950, 953 (E.D.Mich. 1977). Furthermore, Plaintiff admitted in his deposition that he has no evidence of any animus against him by the Executive Board members of the Union officers. [Plaintiff's Dep., p. 474.] Under these circumstances, it is clear that Plaintiff has failed to make out a legally cognizable DFR claim. Therefore, his hybrid § 301 claim must be dismissed not only as against the Union but also as against MichCon.

### 2. *There Was No Breach of Contract With Regard to Plaintiff's Discharge*

■ Even assuming *arguendo* that Plaintiff can make out a DFR claim against his union, Defendants are still entitled to summary judgment on Plaintiff's hybrid Section 301 claim because Plaintiff cannot establish a breach of the collective bargaining agreement. Plaintiff admitted that he was subject to both the CBA and the CES. It is undisputed that the assessment of 6 points for the referral and receipt of payment for the referral of MichCon customers to DCS was authorized under the CES and was imposed upon all offenders who met MichCon's criteria of proof. The six points plus Plaintiff's prior record put his point total at 15, which under the CES and the CBA was just cause for discharge. Therefore, Plaintiff cannot show a breach of contract on the part of his employer.

### C. PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE CLAIM OF DISCRIMINATION UNDER THE MICHIGAN ELLIOTT–LARSEN CIVIL RIGHTS ACT

### 1. PLAINTIFF'S CLAIM AGAINST INDIVIDUAL DEFENDANT MIMS MUST *BE DISMISSED*

■ As an initial matter, the Court finds that Plaintiff's Elliott–Larsen claim against individual Defendant Sol Mims must be dismissed.

In *Jager v. Nationwide Truck Brokers, Inc.,* 252 Mich.App. 464, 652 N.W.2d 503 (2002), the Michigan Court of Appeals determined that, notwithstanding the language of the Elliott–Larsen Civil Rights Act, individual defendants who are responsible for making personnel decisions affecting a plaintiff-employee cannot be held individually liable separate from the employer for actions toward the employee that violate the Act.[13] Based upon an examination of the statutory scheme and remedial provisions of the Michigan Act the *Jager* court determined that "the language in the definition of 'employer' concerning an 'agent' of the employer, was meant merely to denote respondeat superior liability, rather than individual liability." 252 Mich.App. at 484, 652 N.W.2d at 514–15. The court further noted that in examining Elliott–Larsen Act claims, Michigan courts frequently looked to federal decisions construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000–(e), and took note that in *Wathen v. General Electric Co.,* 115 F.3d 400, 403–406 (6th Cir.1997), the Sixth Circuit Court of Appeals similarly held

---

**13.** The Elliott–Larsen Act provides that "An employer shall not ... fail or refuse to hire or recruit, discharge or otherwise discriminate against an individual with respect to employment, compensation, or a ter, condition or privilege of employment, because of religion, race, color, national ori-

gin, age, sex, height, weight, or marital status."
M.C.L. § 37.2202(1)(a). "Employer" is defined in the statute as:
a person who has 1 or more employees, *and includes an agent of that person.*
M.C.L. § 37.2201(a).

that, notwithstanding the language of Title VII, individual supervisors and managers, who do not otherwise qualify as "employers" may not be held liable under the federal Act.[14] The *Jager* court found this federal authority persuasive and, after examining the Michigan Act's statutory scheme, concluded:

> Read as whole, the CRA envisions, in our opinion, employer liability for civil rights violations that result from the acts of its employees who have the authority to act on the employer's behalf rather than individual liability for this civil rights violations. Further, had our Legislature intended individual rather than employer liability under the CRA, it could have expressly stated so. Thus, we conclude that the CRA provides solely for employer liability, and a supervisor engaging in activity prohibited by the CRA may not be held individually liable for violating a plaintiff's civil rights.

252 Mich.App. at 485, 652 N.W.2d at 515.

In reaching its conclusion, the *Jager* court did acknowledge that 17 years earlier it had held that individual liability existed under the Elliott–Larsen Act in *Jenkins v. Southeastern Michigan Chapter, American Red Cross*, 141 Mich.App. 785, 369 N.W.2d 223 (1985). However, because the *Jager* court was not bound by that decision,[15] and because *Jenkins* relied on a federal district court decision, *Munford v. James T. Barnes & Co.*, 441 F.Supp. 459 (E.D.Mich.1977), which was, in the first place, not controlling and which has since been at least implicitly overruled by *Wathen,* the *Jager* court declined to follow *Jenkins.*

■ As a federal district court, this Court is bound by the decisions of Michigan's intermediate appellate courts unless it is convinced that the Michigan Supreme Court would decide the question differently. *See Comiskey v. Automotive Industry Action Group,* 40 F.Supp.2d 877, 891 (E.D.Mich.1999) (quoting *United of Omaha Life Ins. Co. v. Rex Roto Corp.,* 126 F.3d 785, 789 (6th Cir.1997)). Given the fact that the Michigan Supreme Court has recently observed, at least peripherally, that the reference to "agent" in the Elliott–Larsen Act's definition of employer "addresses an employer's vicarious liability," *see Chambers v. Trettco, Inc.,* 463 Mich. 297, 310 614 N.W.2d 910, 915 (2000), this Court cannot say that it is "convinced" that the Michigan Supreme Court would construe the Michigan statute differently than the Court of Appeals did in *Jager.*[16]

---

**14.** As the *Jager* court observed, the Sixth Circuit's holding in *Wathen* expresses the prevailing view of the majority of federal courts. *See* 252 Mich.App. at 480 n. 7, 652 N.W.2d 503 and cases cited therein.

**15.** *See* M.C.R. 7.215(I)(1) which provides in relevant part:

> (1) Precedential Effect of Published Decisions. A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990,* that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule.

**16.** The Court acknowledges that in *Comiskey, supra,* it declined to hold that individual employee/supervisors may not be held liable under the Michigan statute. However, *Comiskey* (which relied upon *Jenkins, supra* ) pre-dates both *Jager* (which rejects *Jenkins* ) and *Chambers.* As such, in refusing to limit liability under the Elliott–Larsen Act, the Court did not have the benefit of the Michigan courts' most recent rulings on this issue, and cannot, in view of those decisions, say it remains convinced that the Michigan Supreme Court would hold differently.

However, in reaching this decision, this Court does not necessarily endorse the Michigan Court of Appeals' interpretation of the language in the Elliott–Larsen Act in *Jager,* as it believes that the language "includes an agent of that employer," could, under principles of strict statutory construction, well be read as extending liability to individuals.

*Jager* establishes that Plaintiff's Elliott–Larsen claim against Defendant Mims is not legally cognizable. Therefore, that claim will be dismissed.

### 2. PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE CLAIM OF NATIONAL ORIGIN DISCRIMINATION

As indicated, Plaintiff has alleged a claim of national origin discrimination under the Michigan Elliott–Larsen Civil Rights Act based solely upon the three three-point assessments of disciplinary points for abuse of time on December 17, 1998, October 29, 1999, and July 27, 2000, and not upon the assessment of the 6 additional points for violation of the No Solicitation policy which ultimately led to his termination.

It is well-established that the burden is on the employment discrimination plaintiff to establish a *prima facie* case of discrimination. *See Carden v. General Motors,* 156 Mich.App. 202, 210, 401 N.W.2d 273 (1986), *lv. den.,* 428 Mich. 891, 403 N.W.2d 811 (1987); *Lautermilch v. Findlay City Schools,* 314 F.3d 271, 275 (6th Cir.2003); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

 An employment discrimination plaintiff can establish his claim of unlawful discrimination under Michigan's Elliott–Larsen Civil Rights Act either (1) by producing direct evidence of discrimination or (2) by presenting a *prima facie* case of discrimination in accordance with the *McDonnell Douglas/Burdine* framework established by the United States Supreme Court for use in Title VII cases. *Hazle v. Ford Motor Co.,* 464 Mich. 456, 462–63, 628 N.W.2d 515, 520–21 (2001); *Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 694–95, 568 N.W.2d 64, 67–68 (1997). Plaintiff here contends that he can make out his claim of discrimination under both theories.

### a. Direct Evidence of Discrimination

 "Direct evidence" of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Sniecinski v. Blue Cross and Blue Shield,* 469 Mich. 124, 666 N.W.2d 186, 192 (2003): *Hazle v. Ford Motor Co., supra,* 464 Mich. at 462, 628 N.W.2d at 520 (quoting *Jacklyn v. Schering Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999)). When a plaintiff can cite direct evidence of discrimination, the *McDonnell Douglas/Burdine* shifting burdens of proof are not applicable. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *DeBrow v. Century 21 Great Lakes, Inc.,* 463 Mich. 534, 539, 620 N.W.2d 836, 838 (2001).

 As indicated above, direct evidence has been defined in this context as evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor. Direct proof of discriminatory animus, thus, includes such things as racial slurs and comments about a person's age or gender made by decision makers. *Lamoria v. Health Care & Retirement Corp.,* 230 Mich.App. 801, 807–811, 584 N.W.2d 589 (1998), *vacated but*

---

Otherwise, this phrase is merely surplusage, as it adds nothing to the definitional scope of "employer," which itself defines the term "employer" as a person. But, for the same concern about important principles of Feder-

alism that the Court set out in *Comiskey* in deciding to follow *Jenkins,* it cannot simply ignore *Jager's* different interpretation of the language.

*reinstated by conflict panel,* 233 Mich.App. 560, 593 N.W.2d 699 (1999). For example, statements such as "If I have to, I will get rid of the older guys—you older guys and replace you with younger ones," made by a decision maker, have been held to constitute "direct evidence" of discrimination. *See Downey v. Charlevoix Co. Bd. of Road Commissioners,* 227 Mich.App. 621, 633, 576 N.W.2d 712 (1998). However, statements by decision makers that are unrelated to the employment decision at issue do not constitute direct evidence that unlawful discrimination was a determining factor in the employer's decision. *Wells v. New Cherokee Corp.,* 58 F.3d 233, 237–238 (6th Cir.1995); *McCarthy v. Kemper,* 924 F.2d 683, 686–687 (7th Cir.1991); *Harrison v. Olde Financial Corp.,* 225 Mich.App. 601, 608, n. 7, 572 N.W.2d 679 (1997); *Hatmaker v. Xerox,* 1998 WL 1991212, *3 (Mich. App.1998). Rather, to qualify as direct evidence of discrimination, such remarks must relate to the employment decision at issue. *McCarthy, supra* at 686; *Hatmaker, supra.* Comments that are isolated or ambiguous or remote in time in relation to the employment decision at issue generally have been held not to constitute direct evidence. *See Foster v. Tweddle Litho Co.* 2002 WL 207575, *1 (Mich.App.2002), citing *Krohn v. Sedgwick James of Michigan, Inc.,* 244 Mich.App. 289, 297–300, 624 N.W.2d 212 (2001).

b. *Mixed Motive Treatment*

█ In a direct evidence case involving mixed motives, i.e., where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a "substantial" or "motivating" factor in the decision. *Sniecinski v. Blue Cross and Blue Shield, supra,* 666 N.W.2d at 193; *Harrison v. Olde Financial Corp.,* 225 Mich. App. 601, 606–607, 572 N.W.2d 679, 683–84

(1997). In addition, a plaintiff must establish his qualification or other eligibility and present direct proof that the discriminatory animus was causally related to the decisionmaker's action. *Sniecinski, supra; Harrison, supra.* Upon such presentation of proofs, an employer may not avoid trial by merely "articulating" a nondiscriminatory reason for its action. Rather, "the defendant may avoid a finding of liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in the decision." *Sniecinski, supra.* As such, under such circumstances, the case ordinarily must be submitted to the factfinder for determination. *Harrison, supra.*

█ In support of his direct evidence/mixed motive theory, Plaintiff here points to a single comment allegedly made by Mims to Mark Foster, a Service Technician and former union steward, who, after disciplining another employee, allegedly told Foster "your Mexican friend is next." However, as indicated above, to be considered "direct" evidence of discrimination, the alleged comments must be directly related to the decision at issue in order to prove discriminatory intent. *McCarthy, supra* at 686; *Hatmaker, supra.* Statements by decision makers that are unrelated to the employment decision at issue do not constitute direct evidence that unlawful discrimination was a motivating factor in the employer's decision. *Wells v. New Cherokee Corp, supra; McCarthy v. Kemper, supra; Harrison v. Olde Financial Corp., supra.* As the court explained in *Butcher v. Gerber Prod. Co.,* 88 F.Supp.2d 788 (W.D.Mich.2000):

Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden of demonstrating animus.... [A] proffer of direct evidence must not only speak directly to the issue of discriminatory in-

tent, it also must relate to the specific employment decision in question.

*Id.* at 792 (citations and internal punctuation omitted).

It is undisputed that Mims' alleged "your Mexican friend is next" comment was not in any way related to the discipline concerning Plaintiff at issue here. Plaintiff testified that he thought Mims made the comment some time between his last two 3–point disciplinary assessments. As it was made after the first of these, it is clear there can be no causal connection to the discipline. And, as to the second assessment, Mims entered into a very favorable agreement that allowed Plaintiff to expunge all three points if his record would remain clean for one year.

Mark Foster testified that Mims allegedly made the comment on December 8, 1999. [*See* Foster Dep., p 23.] This means that the comment was made five weeks after Mims brought Plaintiff's second abuse of time to the attention of his supervisor, Bruce Gustavson (*see* October 29, 1999 counseling, Plaintiff's Dep. pp. 163–65, MichCon Ex. 7), and nine months before Mims brought Plaintiff's third abuse of time violation to his supervisors' attention (July 27, 2000 counseling, Plaintiff's Dep. p. 163, MichCon Ex. 11).

The foregoing makes clear that there is no temporal relationship between the alleged discriminatory comment and the alleged adverse employment actions of which Plaintiff complains in this action.[17] Lacking such a temporal nexus, and lacking a causal connection with the assessments of disciplinary points of which Plaintiff complains, Mims' comment is insufficient to establish discriminatory animus under a mixed motive or direct evidence theory of discrimination. *See e.g., Lawrence v. Syms Corp.,* 969 F.Supp. 1014, 1017–18 (E.D.Mich.1997) (supervisor's comment "that the defendant was 'out to get' the oldest store managers who were well paid, and replace them with younger, more energetic people" held not to raise an issue of material fact showing the employer's discriminatory motivation because it was isolated, remote in time, vague, and unrelated to the discharge decision); *Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.1993) (manager's statements nearly a year before the layoffs were made too long before the layoff to have influenced the termination decision and, therefore, was insufficient to establish the necessary inference of discrimination); *see also, Krohn v. Sedgwick James of Michigan, Inc., supra,* 244 Mich. App. at 297–300, 624 N.W.2d 212 (collecting cases and concluding that trial court properly excluded ageist comment allegedly made by plaintiff's supervisor 11 months before his termination).

The foregoing establishes that Plaintiff cannot make out a *prima facie* claim under a "mixed motive" or "direct evidence" theory.[18]

**17.** Although Plaintiff has specifically stated that only his pre-discharge assessments of 3 points, and not his termination, form the basis for his discrimination claim, the Court notes that, based on the testimony of record, Mims' alleged comment was made almost *17 months* before MichCon terminated Plaintiff's employment on April 24, 2001.

**18.** Although in *Desert Palace, Inc. v. Costa,* —— U.S. ——, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the United States Supreme Court determined that, pursuant to the 1991 amend-ments to the Civil Rights Act, a plaintiff in a Title VII action may make out a *prima facie* claim of discrimination in a "mixed motive" case using either direct evidence or circumstantial evidence under the *McDonnell Douglas/Burdine/Reeves* paradigm, the Michigan courts continue to require that mixed motive cases under the Elliott–Larsen Civil Rights Act be established by direct evidence. *See Sniecinski v. Blue Cross and Blue Shield of Michigan, supra,* 469 Mich. 124, 666 N.W.2d 186 (decided July 22, 2003, i.e., more than a month after the U.S. Supreme Court's *Costa*

## c. Plaintiff's Claim of Discrimination Under the *McDonnell Douglas/Burdine Framework.*

Where the plaintiff has no direct evidence of impermissible bias, in order to avoid summary judgment, he must proceed through the steps set forth in *McDonnell Douglas. Hazle, supra,* 464 Mich. at 462, 628 N.W.2d at 520. The *McDonnell Douglas* approach allows a plaintiff "to present a rebuttable *prima facie* case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *Id.* (quoting *De-Brow v. Century 21 Great Lakes, Inc., supra,* 463 Mich. at 537–38, 620 N.W.2d 836).

■■■■ To establish an Elliott–Larsen discrimination claim using the *McDonnell Douglas* framework, a plaintiff is required to present evidence that he was (1) a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently.

*Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 568 N.W.2d 64 (1997). If the plaintiff successfully proves a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *Hazle, supra; Lytle v. Malady (On Rehearing),* 458 Mich. 153, 172–73, 579 N.W.2d 906, 913 (1998); *McDonnell Douglas, supra; Burdine, supra.* Once the employer carries this burden, the burden of production shifts back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but rather were a pretext for unlawful discrimination. *Hazle, supra* at 465–66, 628 N.W.2d 515; *Town, supra,* at 698, 568 N.W.2d 64; *Lytle, supra,* at 175–76, 579 N.W.2d 906. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089.

■■■ Plaintiff here has offered no evidence whatsoever that comparable, non-protected class employees were treated differently for similar conduct. In fact, Plaintiff admitted that he does not know whether Mims ever disciplined other employees for abuse of time.[19]

decision); *Topping v. Ferris State University,* 2003 WL 21508488* 6 (Mich.App., July 1, 2003) (unpublished decision; text available on WESTLAW). The Court notes that it would not be the first time that Michigan has diverged from U.S. Supreme Court Title VII rulings in construing the Elliott–Larsen Act. For example, in the circumstantial proof context, Michigan requires "pretext plus" to rebut an employer's proffered non-discriminatory articulated reason for its action despite the fact that the U.S. Supreme Court has specifically rejected such a requirement in the Title VII context. *Compare, See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147–148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) *with Lytle v. Malady (On Rehearing),* 458 Mich. 153, 579 N.W.2d 906, 916 (1998) and *Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 568 N.W.2d 64, 68–69 (1997).

**19.** At oral argument, Plaintiff's counsel argued that Plaintiff had presented evidence of comparable employees being treated more fa-

vorably and cited the Court to a number of pages from Plaintiff's deposition. The Court has reviewed the cited deposition pages and finds, contrary to the representations of Plaintiff's counsel, no testimony regarding similarly-situated non-protected class employees being treated differently than Plaintiff for the same conduct.

Plaintiff has attached to his Supplemental Brief his own new Affidavit in which he now states that he has "personal knowledge" that Roger Hunley, a Caucasian field technician, was caught in a violation of abuse of time and Ron Guyton, a black field technician, was caught in some other major work rule violation, but neither Hunley nor Guyton received any points for their violations. This is directly contradictory to Plaintiff's deposition testimony:

Q: With regards to the allegation of ethnic discrimination that you've advanced in this case... is there anyone at MichCon who you can identify who you say was similarly situated to yourself with regards

Having failed to show that any similarly-situated non-protected class employees were treated differently, Plaintiff has failed to make out a *prima facie* case of discrimination.

 However, even assuming *arguendo* that Plaintiff had made out a *prima facie* case, MichCon has articulated a non-discriminatory reason for the disciplinary points given Mr. Millner—major work rule violations. The burden of production, therefore, shifts back to Plaintiff to show

to what you claim occurred and was treated differently?

A [by Plaintiff]: All I know is after I was terminated, there was another guy that was terminated that was the same race as me that Mims gave all the points to.

Q: Who was that?

A: The last name was Rodriguez.

\* \* \* \* \* \*

Q: Do you know the first name?

A: No.

Q: And do you know anything about Mr. Rodriguez's circumstances of employment?

A: No.

\* \* \* \* \* \*

Q: You don't have any personal knowledge of any of the events or circumstances surrounding Mr. Rodriguez's employment, do you?

A: No.

Q: Who did you hear this from?

A: Just other guys at work.

Q: Is there anyone else other than Mr. Rodriguez who you can identify that you say was similarly situated to you?

A: No.

\* \* \* \* \* \*

Q: I'm just going to ask it this way because I think you understand it. Is there anyone that you claim was a MichCon employee you say was similarly situated to you but was treated differently with regards to the circumstances of their employment?

A: I don't know exact details but when other guys get in trouble and they go into these meetings and whatever they work out is what they work out is all hearsay of what I know of how he disciplined other people.

Q: And you're referring, when you say him, to Mr. Mims?

A: Yes.

\* \* \* \* \* \*

Q: Okay. So my question, then, to you is is there anyone that you can identify who you claim was similarly situated to your-

self that was treated differently by Mr. Mims?

A: That's the only one I know of, now what I recognized firsthand, no.

Q: You're referring to Mr. Rodriguez?

A: No, I mean that was handled but I mean there's been incidents with other guys that he didn't give points for certain reasons, whatever he decided to, but I'm not in on those meetings so I can't... so I can't give you a definite answer. It's only what I know from people telling me.

[Plaintiff's Dep. pp. 480–485.]

Plaintiff then added, "There's other guys he's let go plenty of times on incidents," and identified Ronnie Guiton [sic] as one of these "other guys," but he specifically testified, "*I don't know what others were let go on what they did.*" *Id.* at pp. 485–86 (emphasis added.) And, when Plaintiff was asked, "Do you know if Mr. Mims ever wrote any other employees up for abuse of time," Plaintiff answered "I don't know." *Id.* at 486.

Finally, Plaintiff was specifically asked, "Is there anything else that you,... any other facts or evidence that you state you have with regards to your claim of ethnic origin discrimination that you've asserted in this case other than what you've told me?" to which Plaintiff answered, "That's it." *Id.* at p. 487.

Plaintiff's new Affidavit stating that he has personal knowledge of two non-Hispanic field service technicians who were caught in abuse of time or other major work rule violations but received no points directly contradicts his deposition testimony. It is well-settled that a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts his earlier deposition testimony. *See was Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986); *Farrell v. Automobile Club*, 870 F.2d 1129, 1132 (6th Cir.1989); *Penny v. United Parcel Serv.*, 128 F.3d 408, 416 (6th Cir.1997). Therefore, the Court will not consider Plaintiff's new Affidavit in deciding Defendant's Motions for Summary Judgment.

by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but rather were a pretext for unlawful discrimination. *Hazle, supra* at 465–66, 628 N.W.2d 515; *Town, supra,* at 698, 568 N.W.2d 64; *Lytle, supra,* at 175–76, 579 N.W.2d 906. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089. Plaintiff has not met this burden.

In *Lytle v. Malady, supra,* the Michigan Supreme Court affirmed its adoption of what it termed the "intermediate" position in determining whether a plaintiff's showing of pretext is sufficient to survive a motion for summary judgment:

> Under this [intermediate] position, disproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for ... discrimination. Therefore, we find that, in the context of summary disposition, a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.

*Lytle,* 579 N.W.2d at 916 (footnotes omitted); *see also Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 568 N.W.2d 64, 68–69 (1997).[20]

▮ Plaintiff's argument here is simply that Mims made a "mistake" about the addresses where Plaintiff was supposed to be when he was reprimanded for abuse of time for not being where he was scheduled to be on the dates in question. [*See* Plaintiff's Dep., pp. 476–477.] However, a "mistake" by Plaintiff's supervisor is insufficient to establish pretext under Michigan law:

> The plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.

*Town, supra,* 455 Mich. at 704, 568 N.W.2d 64.

Boiled to its essence, Plaintiff here has done nothing more than offer his bare denials of Defendant's stated findings of time abuse in support of his claim that the Defendant's proffered reasons for disciplining him are pretextual. This is not sufficient under Michigan law to withstand summary judgment.

The only other pretext evidence that Plaintiff has proffered is the Mims "your Mexican friend" comment. As discussed above, this isolated, remote comment, unrelated to the discipline imposed upon Plaintiff is insufficient to establish ethnic or racial animus. *See* cases discussed in section 2(a) above. *See also, Manning v. Chevron Chemical Co., LLC,* 332 F.3d 874, 882–83 (5th Cir.2003) (plaintiff's testimony that employee who participated in the decisionmaking process once made a racially derogatory comment held insufficient to demonstrate pretext where comment was not made at or around the time of the promotion decision or that the comment related in any way to that employment decision); *Scott v. Suncoast Beverage Sales, Ltd.,* 295 F.3d 1223, 1228 (11th Cir. 2002) (supervisor's one-time comment "we'll burn his black ass," held insufficient

---

**20.** As noted above, Michigan law differs from federal law in this respect. Under federal law, there is no "pretext plus" requirement.

*See Reeves v. Sanderson Plumbing Products, Inc., supra; Peters v. Lincoln Elec. Co.,* 285 F.3d 456 (6th Cir.2002).

to establish pretext because it was made approximately two and one-half years before plaintiff's termination, and because it was not directly related to the termination); *Sherman v. American Cyanamid Co.*, 188 F.3d 509, 1999 WL 701911, *5 (6th Cir.1999) (unpublished decision; text available in WESTLAW) (supervisor's comment, "you can't teach an old dog new tricks" held insufficient proof of pretext because there is no direct nexus between the supervisor's comments and the plaintiff's termination).

For all of the foregoing reasons, the Court finds that Plaintiff has failed to establish that Defendant MichCon's articulated reason for the discipline imposed upon him was pretextual. Therefore, Defendant's Motion for Summary Judgment on Plaintiff's Elliott–Larsen discrimination claim will be granted.

## CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that the Motions for Summary Judgment filed by (1) Defendants DTE Energy Company, Michigan Consolidated Gas Company, and Sol Mims, and (2) Defendant Service Workers International Union Gas Workers Local 80 be, and hereby are GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be, and hereby is, DISMISSED, with prejudice.

## JUDGMENT

The Court having this date entered an Opinion and Order granting Defendants' Motions for Summary Judgment and dismissing Plaintiff's Complaint in its entirety, with prejudice,

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a JUDG-MENT OF DISMISSAL, WITH PREJUDICE be, and hereby is, entered.