Paul GINDERSKE, Plaintiff,

v.

EATON CORPORATION and Paper, Allied–Industrial, Chemical and Energy Workers International Union AFL–CIO, CLC and Local 6–433, Defendants.

No. 03–10104–BC.

United States District Court,
E.D. Michigan,
Northern Division.

May 12, 2004.

Victor J. Mastromarco, Jr., Cady, Mastromarco, Saginaw, MI, for Plaintiff.

Alan C. Harnisch, Harnisch & Hohauser, Lawrence S. Gadd, Harnisch, Lebow, (Bingham Farms), Bingham Farms, MI, James M. Moore, Gregory, Moore, Detroit, MI, for Defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

LAWSON, District Judge.

The plaintiff, Paul Ginderske, was fired for insubordination from his union-protected manufacturing job with defendant Eaton Corporation. His union, Local 6–433 of the Allied–Industrial, Chemical and Energy Workers International Union AFL–CIO, CLC (the Union), challenged the termination through the grievance procedure set forth in the collective bargaining agreement (CBA), but declined to pursue the last step in the process, which was formal arbitration. Thereafter, Ginderske filed the present action in this Court as a so-called "hybrid action" against both his union and his former employer, as he must, contending that Eaton breached the CBA by firing him and the Union breached its duty of fair representation. All defendants have moved for summary judgment. The Court heard arguments on the record on May 4, 2004 and now finds that the plaintiff has not come forth with evidence creating a material fact issue on the essential elements of his claims against either Eaton or the Union, and that the defendants are entitled to judgment in their favor as a matter of law. The motions for summary judgment, therefore, will be granted.

I.

Paul Ginderske claims that Eaton unlawfully fired him for insubordination when he did not abide by instructions given him on the plant floor by a supervisor, but which he had questioned and in the course had sought assistance from a union steward in dealing with his supervisor. Ginderske was represented by the Union, which had entered into a collective bargaining agreement with Eaton. In that CBA, Ginderske relinquished his individual right to judicial relief in favor of the dispute resolution procedure set forth therein as the employee's exclusive remedy. Pl.'s Br. in Resp. to Def.s' Mot. Summ. J. Ex. 6 at 2–4. Normally, a suit of this nature therefore would be barred, but when the employee also contends that his union failed in its fiduciary duty to represent him against the employer, the employee may maintain such a suit under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (LMRA). *See Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (holding that a "wrongfully dis-

charged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance").

The dispute in this case was triggered by incidents that occurred on October 2 and 3, 2002. On those dates, Ginderske was employed at Eaton's engine plant in Saginaw, Michigan as a utility worker, who was assigned generally to various assembly line jobs to take the place of other workers who were sick or on vacation. On that particular shift—the so-called "graveyard shift" from 11:00 p.m. to 7:00 a.m.— Ginderske was working at "operation ninety" on an assembly line that manufactured cylinder heads. Eaton's Mot. Summ. J. Ex. A, Paul Ginderske Dep. at 32, 36. He initially worked in the foundry at the plant pouring iron when he started there in May 1995. *Id.* at 34.

A worker assigned to an "operation" station on the assembly line is responsible for overseeing the manufacture of the cylinder head as it passes through the individual station. Operation ninety was where the cam heads were manufactured, passing through a series of brushes at that station. Each operation station is equipped with an alarm and a flashing light. If a problem occurs at a particular station, the station will "alarm out," that is, the flashing light and alarm will activate. When an operation station alarms out, the station worker is required to address the problem. If the problem is not addressed within a certain time period, the machine at the operation station will shut down, which eventually causes the entire assembly line to halt its operation.

Approximately 30 to 45 minutes after the plaintiff started his shift at operation ninety on October 2, 2002, he left his station to get a cup of coffee at the machine repair shop in the building where he was working. He estimated that the repair shop was approximately 30 to 40 yards from his station and that he was gone for five to six minutes. *Id.* at 39–40. While away from his station, operation ninety "alarmed out" because brushes on the machine needed to be replaced. Apparently, the plaintiff's supervisor, Nick Buckley, walked passed the plaintiff as he was getting a cup of coffee at the repair shop and did not say anything to him. *Id.* at 42. However, at some point thereafter, it appears that Buckley noticed that the plaintiff's station was sounding its alarm indicating that it needed attention. Buckley then paged the plaintiff over the plant's intercom system. *Id.* at 40–41. The plaintiff returned to his station where he was confronted by Buckley who, according to the plaintiff, used a "loud tone of voice, kind of angrily" when speaking to him. Buckley told the plaintiff to get another co-worker, Greg Schrank, to change the brushes on his machine and instructed him not to leave his station except on his designated breaks at 1:00 a.m., 3:00 a.m., and 5:00 a.m. Buckley told the plaintiff that if he needed to leave at another time, he must tell another co-worker so that the person could cover the plaintiff's station. *Id.* at 42–44. The plaintiff asked Buckley if his instructions pertained to all workers or just him. According to the plaintiff, Buckley responded that they pertained only to him. *Id.* at 48.

The plaintiff notified Mr. Schrank to change the brushes on his machine. While Schrank was changing the brushes, the plaintiff and Buckley continued their conversation about the plaintiff being absent from his station when the alarm sounded. The plaintiff claims he told Buckley that he was being harassed and asked Buckley to call his union representative, committeeman Billy Cork. *Id.* at 48. According to

the plaintiff, Buckley "laughed" about the plaintiff's request and, directing his attention to Schrank, joked about the plaintiff's belief that he was being harassed. *Id.* at 49. Buckley maintains that he did not call the Union committeeman.

Approximately 45 minutes later, at about 12:30 a.m. on October 3, 2002, the plaintiff again left his station at operation ninety, this time to visit the bathroom. *Ibid.* The plaintiff claims that he attempted to tell another co-worker that he was leaving, but he could not find anyone working nearby so he left his station unattended. While he was gone, his machine once again alarmed out. *Id.* at 61. As the plaintiff was returning to his station, he claims that Buckley came at him "screaming" and was "waving his hands and arms." *Id.* at 55. Buckley stated that he was going to "write up" the plaintiff for not being at his station. *Id.* at 58. The plaintiff responded that he felt he was being harassed and wanted to speak with his union representative, Mr. Cork. *Id.* at 58. Buckley told the plaintiff to return to his station and to "start loading parts" onto the assembly line. *Id.* at 63–64. At this point, another co-worker, Gloria David, approached the plaintiff and reprimanded him for failing to load the parts onto the assembly line. The plaintiff testified in his deposition that he responded that Ms. David should "f* *k that." *Id.* at 66. Ms. David claimed in her deposition that the plaintiff said "f* *k you." Eaton Mot. Summ. J. Ex. C, Gloria David Dep. at 29–30, 66–67.

Approximately 15 minutes later, at 12:45 a.m., the plaintiff left his station a third time to call Mr. Cork, who was working in another building, because Cork had not appeared as requested. Eaton Mot. Summ. J. Ex. A, Ginderske Dep. at 85–86. While the plaintiff was on the telephone with Cork, Buckley approached him and told him to get off the phone and return to

his station. *Id.* at 86. The plaintiff told Cork over the phone that he needed Cork to come quickly because he believed that Buckley was going to write him up. The plaintiff then got off the phone and returned to his station.

At about 2:30 a.m., Mr. Cork arrived at the plaintiff's building. The plaintiff states that he saw Cork first go into Buckley's office and talk with him. Then Cork came to the plaintiff's station and spoke with the plaintiff. *Id.* at 90–91. According to the plaintiff, Cork said that he knew that "they" were after the plaintiff and to calm down and he would see what he could do. *Id.* at 91. Cork testified that Buckley had informed him that the plaintiff may be written up for insubordination. Pl.'s Ex. 3, Billy Cork Dep. at 31–32. Cork did not relay this information to the plaintiff when he talked to him after speaking with Buckley. *Id.* at 36–37.

The plaintiff remained at operation ninety until 4:30 a.m. when Buckley asked him to work on a different machine in a different area of the plant. *Id.* at 92. The plaintiff worked on this machine until approximately 6:50 a.m., ten minutes before his shift ended. At that time, Buckley and Cork approached him. Buckley informed the plaintiff that he was being "written up" for insubordination and that he was not to return to the plant until he first reported to the office of human resources. *Id.* at 93.

The plaintiff and Cork then left the building and went together to the local union office in another section of the plant. There they met with the president of the local union, Ed Holbrook. The plaintiff told Mr. Holbrook his version of the facts. According to the plaintiff, Holbrook was against him and acted like the plaintiff, not Buckley and the company, were in the wrong. *Id.* at 103–04. The plaintiff met with Holbrook for about ten minutes and

then Holbrook told the plaintiff to go home and that he would contact the plaintiff. At approximately 2:30 that afternoon, Holbrook called the plaintiff and said that he had spoken with Erin Spitzer in the Human Resources Department at Eaton and that the plaintiff's future with the company did not "look good." *Id.* at 107.

In the morning on October 4, 2002, the plaintiff and Mr. Holbrook met with Ms. Spitzer in her office. The plaintiff stated in his deposition that he was given an opportunity to explain his side of the story. Ms. Spitzer informed the plaintiff that he was being terminated and handed him a formal "write up." She asked him to sign it but he refused to sign the document. *Id.* at 109. Mr. Holbrook informed Ms. Spitzer that he would bring the termination before a "full committee" of union members and then Mr. Holbrook signed the document. The document, entitled "Employee Contract Report," provides the following:

> Insubordination—Employee [plaintiff] refused to comply with the supervisor's several requests to stay in the work area [and] if needed to notify an employee without leaving the work area—this happened several different times within the shift causing the machines to set aside [and] not produce parts. When confronted by the supervisor Paul [plaintiff] used intimidating language which the supervisor [and] company believe was in a threatening manner [and] is in direct violation of the, companies [sic] Harassment free work place policy.

Eaton Mot. Sum. J. Ex. E.

After the meeting with Ms. Spitzer concluded, the plaintiff met with Holbrook and Pete Gawne, another union representative. The plaintiff told the union officials that he was the victim of Buckley's harassing behavior and denied all misconduct. Holbrook asked the plaintiff to prepare a written statement as soon as possi-

ble containing his version of the events that gave rise to his termination. The local union then filed a grievance contesting Eaton's decision to terminate the plaintiff. *See* Eaton Mot. Summ. J. Ex. F; Ginderske Dep. at 127.

Mr. Holbrook conducted an investigation of the events surrounding the plaintiff's termination. He obtained a tape recording from Ms. Spitzer in which she summarized the statements she had taken from several employees who had been in the area where the plaintiff was working on October 2 and 3. *See* Eaton Mot. Summ. J. Ex. G, Edward D. Holbrook Aff. at ¶ 8. Holbrook played the tape to Gloria David and Gary Lewis, another co-worker, who both confirmed the accuracy of its contents. Holbrook also showed two other employees, Becky Stoddard and Mel Trammel, copies of statements typed by Ms. Spitzer concerning the plaintiff and both of these employees confirmed the accuracy of the statements. *Id.* at ¶ 9. Holbrook met with Greg Schrank, who was working on the plaintiff's machine when the plaintiff and Buckley were having a discussion. According to Holbrook, Schrank said that he had heard Buckley directing the plaintiff to return to his work area, that the plaintiff yelled at Buckley in a loud and angry manner, and that Mr. Buckley was not loud. *Id.* at ¶ 10. Finally, Holbrook reviewed Ms. Spitzer's summaries of statements from the other employees she interviewed about the incident with the plaintiff. Holbrook stated in his affidavit that none of the employees Ms. Spitzer interviewed and none of the employees he subsequently interviewed as part of his investigation supported the plaintiff's version of the events. *Id.* at ¶ 13.

On October 7, 2002, Holbrook, Gawne, and other union members met with Eaton officials, including Spitzer, to discuss the

plaintiff's termination. Gawne argued to the company that the plaintiff should be reinstated to employment. *Id.* at ¶ 17. The company, however, refused this demand. *Ibid.* The written refusal was sent to union officials on October 10, 2002. After the meeting with Eaton, Gawne advised Holbrook and other union members that he felt that given the strength of Eaton's case against the plaintiff and the absence of evidence supporting the plaintiff (the plaintiff had failed at this time to submit the requested written summary of his version of the events), the union should not persist in protesting the plaintiff's termination to the next and final step in the grievance process, which is arbitration. *Id.* at ¶ 18.

Holbrook called the plaintiff on the telephone and informed him of the outcome of the Union's meeting with the company. He also told the plaintiff that the Union would decide at is executive board meeting on October 23, 2002 whether to send the plaintiff's grievance to arbitration. Holbrook invited the plaintiff to attend the meeting and he accepted that invitation. *Id* at ¶ 19.

At the executive board meeting, Holbrook provided the board members with a "packet of written materials" containing information about the plaintiff's case. The board consisted of nine members of the local union. Holbrook presented his version of the events to the board. The plaintiff then was given an opportunity to give his account of the incident leading to his termination. According to Holbrook, several of the board members asked the plaintiff questions about the incident. Eventually the board, by a unanimous vote, decided not to appeal the plaintiff's grievance to arbitration. *Id.* at ¶ 22.

The plaintiff contacted members of the international union to contest the local union's decision not to arbitrate. The international union investigated the matter and concluded that the local union acted appropriately. *See* Eaton Mot. Summ. J. Ex. K.

On April 22, 2003, the plaintiff filed a complaint in this Court against Eaton, the Union, and Local 6–433. In Count I of the complaint, the plaintiff alleges that Eaton breached the CBA by failing to contact a union representative as the plaintiff had requested and in the manner Eaton disciplined the plaintiff. Count II alleges that the Union breached its duty of fair representation by failing to promptly send a union representative to the plaintiff as he requested and by failing to pursue the plaintiff's grievance to arbitration.

The defendants raise two issues in their motions for summary judgment: they contend that the plaintiff's claims are barred by the sixth-month statute of limitations; and they insist that the undisputed facts compel a judgment on the merits in their favor as a matter of law. The plaintiff responds that fact issues preclude summary judgment on both the claim against the Union for breach of its duty of fair representation and Eaton for violating the CBA.

## II.

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the

just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir.2000). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir.2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir.1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505) (internal quote marks omitted).

### A.

■ The defendants first contend that the plaintiff's causes of action accrued against the Union and Eaton well before

October 23, 2002 when the Union's executive committee decided not to pursue arbitration, and therefore the April 22, 2003 complaint in this Court was filed out of time. They point to the plaintiff's testimony that he became dissatisfied with the union's representation of him on the night in question, October 3, 2002, when he alleged that union representative Cork took two hours to respond to his call, *see* Ginderske Dep. at 349; Compl. at ¶¶ 30–36, and that the union did not properly represent him at his meeting with the company on October 4, 2002. The Union asserts, therefore, that Ginderske's claim against it accrued on that date. Eaton argues that Ginderske's claim against the company accrued on the day he was fired, October 4, 2002.

The applicable statute of limitations for a hybrid Section 301 action is six months. *DelCostello v. International Broth. of Teamsters,* 462 U.S. 151, 169, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). A claim under Section 301 accrues "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Noble v. Chrysler Motors Corp., Jeep Div.,* 32 F.3d 997, 1000 (6th Cir.1994) (citations and quotations omitted). However, the claims against the employer and the union in a hybrid action accrue simultaneously, and " 'the timeliness of the suit must be measured from the date on which the employee knew or should have known of the union's *final action* or should have known of the employer's *final action,* whichever occurs ' " *Robinson v. Central Brass Mfg. Co.,* 987 F.2d 1235, 1239 (6th Cir.1993) (quoting *Proudfoot v. Seafarer's International Union,* 779 F.2d 1558, 1559 (11th Cir.1986)) (emphasis added). *See also McCreedy v. Local Union No. 971, UAW,* 809 F.2d 1232, 1236 (6th Cir.), *reh'g denied,* 818 F.2d 6 (6th Cir.1987) (stating that a hybrid section 301 claim "accrues against the company when it accrues against the union"). Therefore, when assessing the timeliness of such a complaint, the court "must establish a single accrual date for [the hybrid] section 301 claim and then ascertain whether the plaintiff[ ] filed suit within six months of that date." *Fox v. Parker Hannifin Corp.,* 914 F.2d 795, 803 (6th Cir.1990).

■ In this case, although the plaintiff complains about the tardy response of committeeman Cork on the night of the incident and later describes what he perceived as an attitude by Union officials being against him throughout the process, the Union nonetheless initiated the dispute resolution process by filing a grievance to challenge the termination. If the plaintiff and the Union had been successful at any stage of the process, there would have been no legal cause for the plaintiff to complain about the actions of Eaton or the Union. The plaintiff's claim against the Union accrued, therefore, when he learned about the union's *final action* on October 23, 2002 when the union's executive board meeting met and decided by unanimous vote not to appeal the plaintiff's grievance to arbitration. Eaton's final action accrued before this date, probably on October 3, 2002 when it decided not to send for the plaintiff's union representative, Billy Cork, or on October 4, 2002, when it terminated the plaintiff for insubordination. Nonetheless, the Court must establish a single accrual date and that date is established by whichever final action occurred later. *Robinson,* 987 F.2d at 1239. The plaintiff's complaint filed on April 22, 2003 was within six months of the Union's final action on October 23, 2002 and, therefore, the lawsuit is timely.

### B.

Eaton asserts that it was well within its rights under the CBA when it terminated the plaintiff for insubordination when he

refused to follow the direction of his supervisor. The Union contends that it did not discriminate against Ginderske and that its actions in representing him were not arbitrary or made in bad faith, and the plaintiff's claims against it must fail.

The CBA in this case provides that an employee's exclusive remedy against the employer for breaches of the employment agreement is resort to the dispute resolution procedure in the CBA. Pl.'s Br. in Resp. to Def.s' Mot. Summ. J. Ex. 6 at 5. That procedure consists of a five-step process beginning with an informal discussion between a supervisor and the Union representative concerning the employee's complaint and culminates in formal arbitration. *Id.* at 6. An employee has no right to sue the employer directly if the bargained-for process has been followed faithfully. Thus, in order to recover in a hybrid suit under Section 301 of the LMRA the plaintiff must show that Eaton breached the CBA *and* that the Union breached its duty of fair representation. *Bagsby v. Lewis Bros., Inc.*, 820 F.2d 799, 801 (6th Cir. 1987); *see Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); *DelCostello*, 462 U.S. at 163–65, 103 S.Ct. 2281; *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555 (6th Cir.1990). "Unless [the plaintiff] demonstrates *both* violations, he can not succeed against either party." *Bagsby*, 820 F.2d at 801. *See also Black v. Ryder/P.I.E. Nationwide, Inc.*, 930 F.2d 505, 510 (6th Cir.1991) (stating that "[i]n any event, when the union cannot be held liable for unfair representation, of course, the employer cannot be held liable for breach of the collective bargaining agreement").

"The 'interdependency' of a union employee's claims against his employer for breach of a collective bargaining agreement and against his union for breach of its duty of fair representation is well-es-tablished in this Circuit." *Millner v. DTE Energy Co.*, 285 F.Supp.2d 950, 960–61 (E.D.Mich.2003). *See, e.g., White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir.1990) (observing that "if the first claim anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it"); *Lucas v. Leaseway Multi Transportation Service, Inc.*, 738 F.Supp. 214, 220 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991) (noting that "[s]ince plaintiff's count as to the duty of fair representation fails, plaintiff's other count alleging a breach of the CBA also must fail").

1.

Eaton contends that it should prevail as a matter of law on the plaintiff's claim against it because the plaintiff himself admitted that he was insubordinate to his supervisor, Nick Buckley, in the evening and early morning hours of October 2 and 3, 2002 on two separate occasions. Ginderske Dep. at 102–03. Moreover, the plaintiff does not deny using the word "f* *k" towards co-worker Gloria David, whether it be "f* *k that" as he claims or "f* *k you" to which Gloria David testified. However, the plaintiff insists that he never conceded that he was insubordinate and he did not make a threatening remark to a co-worker. The plaintiff argues that since he never agreed to abide by Buckley's instruction that he not leave his work station unless he was on break or contacted another employee, he was not bound to follow the instruction until this dispute was resolved with the plaintiff's Union representative. When this instruction was given to him, the plaintiff asked to speak with his union representative. He claims that it was Eaton that violated the CBA by not promptly notifying committeeman Cork as required by the CBA.

As the plaintiff indicates, page five of the CBA states the following regarding "grievance procedures":

14. Any employee with a concern, problem or complaint shall first contact his or her Supervisor. It is mutually agreed and understood that should any differences arise between the Company and any of the employees as to the meaning and/or application of any of the provisions of this Agreement, or should any local trouble of any kind arise in the plant, the procedure outlined in Paragraph 15 of the Agreement shall apply.

15. STEP I–FLOOR LEVEL. Any employee may request the Supervisor to send for a Union representative to handle the specified grievance with the Supervisor. The Supervisor will send for the Union representative without undue delay and without further discussion of the grievance. This does not prevent the Union representative from presenting the grievance directly to the Supervisor.

Pl.'s Ex. 6 at 5. For the purpose of the pending motions, the Court assumes that Ginderske's disagreement with his supervisor might be considered "local trouble." Contrary to the plaintiff's assertions, however, these provisions do not give the employee the privilege of refusing work and standing by until a Union representative shows up to tell him whether he must return to work. The plaintiff hypothesizes that a rule that compelled him to perform tasks that he deemed dangerous over his protests and absent union representation would compromise worker safety and expose employees to unreasonable risks at the whim of the employer. However, the record does not support a claim that it was a safety concern that animated Ginderske's apparent intransigence that night, and Sixth Circuit precedent does not support his argument in the absence of a bonafide safety issue. *See Poole v. Budd Co.,* 706 F.2d 181 (6th Cir.1983).

In *Poole,* the defendant employer, Budd Company, fired the plaintiff, Gregory Poole, for refusing to accept a job assignment given to him by his foreman. Poole was working in a factory with another individual soaking automobile doors in an acid bath. When Poole's co-worker left to use the restroom, Poole stopped working and leaned up against the tub filled with acid. The foreman noticed Poole standing idle and ordered him to continue working in his co-worker's absence. Poole refused, maintaining that the job was a two-person operation, and he demanded to see a union steward if the foreman persisted. After an unsuccessful search for the steward, the foreman returned and fired Poole. *Id.* at 182. Poole's union filed a grievance on his behalf and began an investigation on whether soaking automobile doors in an acid bath really required two workers to perform the task safely. After it was unsuccessful at the initial stages of the grievance procedure, the union decided not to carry the dispute into arbitration, and Poole, like Ginderske here, filed a hybrid Section 301 action. On appeal, the Sixth Circuit observed that the union's decision to abandon the grievance was supported by "strong evidence," since the operation frequently had been performed by one person and "there was only one relatively minor safety incident attributable to the job as a one-worker operation." *Id.* at 184. The language in the opinion that then follows supports the conclusion that the employee does not have the right to refuse work until his dispute is resolved on the plant floor:

[W]hile the foreman's exact instructions to Poole are disputed, it is undisputed that Poole could have resumed work on an individual basis for at least 12 minutes without having to engage in the asserted two-person aspect of the job, that is, lifting the door from the acid bath.

*Ibid.* Likewise, the record presents no reason that Ginderske could not have followed Buckley's instructions that operation ninety must not be left unattended while the assembly line was operating. The sensible course of action would have been for Ginderske to perform his assigned task "without further discussion of the grievance" and take up his dispute through Union channels at a later time and in accordance with Sections 14 and 15 of the CBA, quoted above.

The CBA and the shop rules gave Eaton the right to terminate Ginderske for his conduct. The CBA provides, in pertinent part, the following regarding disciplinary action:

### DISCIPLINARY ACTION

19. The Company [Eaton] agrees to notify a member of the Bargaining Committee, if working, or in no Committee person is working, the chief steward, at the time of disciplining an employee. If the employee is sent home, he or she may request to see a Union representative before leaving the plant. Serious offenses will be dealt with from reprimand to discharge. All others will be handled in accordance with the following procedure.

4 Step Progressive Discipline Program
    1. Verbal warning with Union representative at time of infraction.
    2. Written warning with Union representative.
    3. A one to 30 day penalty layoff may be given with a Union representative involved.
    4. A discharge may be given with a Union representative involved.

Eaton Mot. Summ. J. Ex. B. at 8. The CBA also includes a section entitled "Shop Rules and Regulations." In this section, the CBA provides that an employee may be discharged for, among other things, theft of company equipment, possessing illegal weapons, fighting on the premises, and leaving the plant during working hours without permission. *Id.* at 62. Furthermore, the shop rules state that

[f]ailure on the part of employees to conform to the following regulations will result in penalties ranging from reprimand to discharge:

. . . . .

8. Insubordination, or the refusal to comply with the requests of supervision is considered a serious offense.

*Id.* at 62–64.

■ The material facts of this case concerning Ginderske's disregard of his supervisor's instructions are undisputed. The plaintiff was told to remain at his work station unless he was on break or found somebody else to cover his station. The plaintiff asked for his union representative. The union representative did not arrive. The plaintiff then disobeyed Buckley's instruction and again left his work station. Each time the plaintiff was absent from his work station, the station alarmed out. It is not clear whether the assembly line was stopped as a result. However, this conduct constitutes insubordination under the CBA.

The plaintiff contends that he requested his union representative, Billy Cork, be contacted "without undue delay" and that Buckley did not contact Cork. Although Buckley's failure may have amounted to a violation of the CBA by Eaton, it does not alleviate the consequences of Ginderske's insubordination. As noted above, Ginderske did not have the right to refuse to work until Cork arrived, and there is no evidence that Cork's late arrival had any impact on Ginderske's conduct. Moreover, the plaintiff's lawsuit against Eaton seeks damages for the termination, not the failure to call a Union representative. Based on the undisputed facts viewed in the light most favorable to the plaintiff, the Court

finds no breach of the CBA by Eaton when it fired Ginderske for insubordination.

## 2.

The Union asserts that its judgment not to demand arbitration in Ginderske's case was sound and informed by a thorough investigation, and therefore it did not breach its duty of fair representation of the plaintiff. The plaintiff counters that Union personnel displayed an unfriendly attitude toward him and they were unwilling to provide him with any meaningful representation. He cites evidence that committeeman Cork took two hours to respond to the plaintiff's aid, although at oral argument the plaintiff conceded that there was no evidence that Cork was actually notified by Buckley or that Cork knew that the plaintiff had requested his presence before the plaintiff personally called him. The plaintiff also argues that the Union failed to interview Melvin Trammel, a witness to the events that occurred between the plaintiff and Buckley. Trammel's testimony is that the plaintiff did not raise his voice when confronting Buckley, and this was inconsistent with the statements of other witnesses.

■ In *Vaca v. Sipes, supra,* the Supreme Court stated that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining agreement is arbitrary, discriminatory or in bad faith." 386 U.S. at 190, 87 S.Ct. 903. "Each of these wrongs is mutually independent, meaning, that 'the three named factors are three separate and distinct possible routes by which a union may be found to have breached its duty.'" *Garrison v. Cassens Transport Co.,* 334 F.3d 528 (6th Cir.2003) (quoting *Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 584 (6th Cir.1994)). A union's conduct is "arbitrary" "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is

so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Association, International v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (citation omitted). Thus, conduct that might amount to negligence or poor judgment will not violate the prohibition against arbitrary conduct. *See United Steelworkers of Am. v. Rawson,* 495 U.S. 362, 372–73, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990). Likewise, although the union's duty includes undertaking a "reasonable investigation," *Black,* 15 F.3d at .585, that duty "does not require [the] union to exhaust every theoretically available procedure simply on the demand of a union member." *St. Clair v. Local Union No. 515, Int'l Bhd. of Teamsters,* 422 F.2d 128, 130 (6th Cir.1969) (internal citations omitted). "A union may breach its duty, however, if it processes a grievance in a perfunctory manner." *LaCortiglia v. Aluminum Co. of Am.,* 976 F.Supp. 707, 711 (N.D.Ohio 1997) (citing *Milstead v. International Bhd. of Teamsters,* 580 F.2d 232, 235 (6th Cir.1978)).

■ "Judging whether a union has acted discriminatorily or in bad faith ordinarily presents a simple and straightforward issue." *Black,* 15 F.3d at 584. The plaintiff does not contend that the Union discriminated against him, nor does the record suggest any classification within which the plaintiff might have been grouped for the purpose of disparate treatment. "Bad faith" has been characterized as union actions lacking "complete good faith and honesty of purpose in the exercise of its discretion." *Apperson v. Fleet Carrier Corp.,* 879 F.2d 1344, 1355 (6th Cir.1989) (quoting *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 564, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976)). Despite the plaintiff's protestations, he has not come forward with the requisite proof to show that the Union's actions were motivated by personal animus or lacked good faith and honesty in dealing with him.

The Supreme Court has held that an employee must come forth with "substantial evidence" proving that his union breached its duty of fair representation. *See Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). Evidence that a union chose not to proceed with a grievance through arbitration alone will not suffice, since the Court, as a matter of public policy, affords great deference to the union's decision to abandon a grievance it deems meritless.

> In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement.
>
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievance would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

*Vaca,* 386 U.S. at 191, 87 S.Ct. 903.

The plaintiff's claim against the Union largely is based on Cork's failure to arrive timely at the scene, the Union's decision not to arbitrate, and the alleged inadequate investigation. However, there is no indication that Cork's arrival two hours after he was called by the plaintiff was motivated by bad faith. Moreover, there is no indication that the union representative's failure to promptly arrive when called is "so far outside the wide range of reasonableness as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127. Although there may have been some animus towards the plaintiff by members of the Union, including President Holbrook, the Union's actions do not indicate that fair representation was not afforded to the plaintiff. The Union undertook a "reasonable investigation," which is all that is required. *See Black,* 15 F.3d at 585. Although the plaintiff claims that the Union failed to interview a key witness, Melvin Trammel, the affidavit of Mr. Holbrook indicates that this co-worker was consulted. In addition, the failure to interview one witness when many others were interviewed does not make the entire investigation unreasonable. In addition to undertaking an investigation into the incident, the Union filed a grievance on the plaintiff's behalf and requested that Eaton reinstate the plaintiff. This conduct cannot be considered "wholly irrational" under the circumstances. Rather, the Union clearly acted in a manner to fairly represent the plaintiff and there is no indication that the so-called predisposed attitude towards the plaintiff caused the Union to not fairly represent him.

Finally, the Union's failure to seek arbitration on behalf of the plaintiff does not

constitute a breach of its duty of fair representation. As the *Vaca* court stated, the Union cannot be compelled to arbitrate a grievance if the facts demonstrate that the case is without merit. Since the Union's reasonable investigation led it to the conclusion that Ginderske's conduct was indefensible, the Union did not breach its duty of fair representation by declining to defend it at arbitration.

## III.

As noted above, the plaintiff in a hybrid action is required to establish his claims against both the employer and the union. In this case, the plaintiff has done neither. The Court finds that there is no material fact dispute on whether Eaton breached the CBA or the Union failed to properly represent the plaintiff. Both defendants are entitled to summary judgment as a matter of law.

Accordingly, it is **ORDERED** that the motions by Eaton Corporation [dkt # 27] and the Union [dkt # 28] are **GRANTED**.

It is further **ORDERED** that the plaintiff's complaint is **DISMISSED WITH PREJUDICE.**